## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ANDREA LEAH HECKEL,

      Plaintiff,

v.                                                               CV 13-0364 WPL

CAROLYN W. COLVIN, ACTING COMMISSIONER
OF SSA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Andrea Leah Heckel filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments on July 16, 2010. (Administrative Record ("AR") 11, 164.) She alleged that she had been disabled from November 4, 2009, due to bipolar/manic depressive disorder, post-traumatic stress disorder ("PTSD"), anxiety disorder, borderline personality disorder, agoraphobia, multiple suicide attempts, and gastrointestinal disorders. (AR 126, 133, 168.) Administrative Law Judge ("ALJ") Michelle K. Lindsay held a hearing on Heckel's application on March 20, 2012. (AR 23.) She denied Heckel's applications, determining that Heckel was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (AR 22.) Heckel requested review by the Appeals Council, but that request was denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-4.)

Heckel sought a review of the SSA's decision (Doc. 1) and filed a motion to reverse and remand for rehearing (Doc. 19). The Acting Commissioner of the SSA ("Commissioner") responded (Doc. 20), and Heckel filed a reply (Doc. 21). After having read and carefully

considered the entire record and the relevant law, I grant Heckel's motion and remand this case
to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial
evidence in the record and whether the correct legal standards were applied. *See Hamlin v.
Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such
relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall
v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084
(10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record
overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214
(quotation omitted). However, substantial evidence does not require a preponderance of
evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d
1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh
the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at
1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct
legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019
(10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability.
*See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R.
§§ 404.1520, 416.920 (2013). If a finding of disability or nondisability is directed at any point,
the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three
steps, the ALJ considers the claimant's current work activity and the severity of her impairment

or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, she is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Heckel, age thirty-seven, is a high-school graduate who has consistently worked in finance-related jobs since the mid-1990s. (AR 29, 170.) Her potential disability onset date was November 4, 2009, which is the day after she was terminated from her most recent account clerk position. (AR 28, 168.)

In January 2009, Heckel was briefly jailed for her alleged involvement in a domestic dispute with her partner. (AR 284, 289.) At an initial screening by the psychiatric services unit at Bernalillo County Metropolitan Detention Center ("MDC"), Heckel reported a two-week hospitalization for depression three years beforehand, and she stated that she "tends" to cut herself. (AR 284.) Heckel was then referred for a psychiatric evaluation at the facility, where she was reported to have a history of manic depressive disorder, anxiety disorder not otherwise specified, and borderline personality disorder. (AR 280-81.) It was also noted that Heckel suffered from chronic back pain, irritable bowel syndrome ("IBS"), and other physical maladies. (AR 281.) Heckel was assessed as having severe psychosocial stressors and said to have a GAF

score of forty-five,[1] though the evaluator concluded that Heckel was not seriously mentally ill. (*Id.*)

When she was released several days later, Heckel visited John Vigil, M.D., and reported anxiety, depression, and thoughts of self-harm, though Dr. Vigil observed no acute distress. (AR 265.) Dr. Vigil assessed an unspecified episodic mood disorder and prescribed Celexa and Xanax. (*Id.*) The following month, Heckel underwent an evaluation by Gayle M. Boyd, Ph.D., prior to a hearing in her domestic violence case. (AR 289.) Dr. Boyd observed that Heckel was tearful, but otherwise her mood was appropriate, her concentration was adequate, and she reported no suicidal ideation. (*Id.*) Heckel said that she was on medication for anxiety, and she stated that she used to smoke marijuana daily but had stopped when she met her current partner. (AR 290.) Dr. Boyd diagnosed Heckel with an adjustment disorder with anxiety, primary support stressors, and a GAF of 70.[2] (AR 290-91.) Heckel later said that she discontinued treatment with Dr. Boyd because she could not afford it. (AR 174.)

Heckel lost her most recent job in November 2009. (AR 168.) In March 2010, having been arrested for aggravated assault on her housemate, Heckel was again evaluated by the psychiatric services unit at MDC after reporting that Dr. Vigil had prescribed medication for

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.* As Heckel acknowledges (Doc. 19 at 7 n.4), the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule; however, all of Heckel's relevant medical providers used this scoring method.

[2] A GAF score between sixty-one and seventy is assessed when the patient is believed to have "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but [is] generally functioning pretty well, [with] some meaningful interpersonal relationships." Am. Psychiatric Ass'n 34.

depression and suicide attempts. (AR 270-72.) Specifically, Heckel stated that she had been taking Seroquel, though she said that the prescription had run out almost three months earlier. (AR 272.) Heckel denied current suicidal ideation, though she reported a history of suicide attempts. (AR 270-71.) Although Heckel was diagnosed with an unspecified mood disorder, PTSD, and borderline personality disorder, she was not considered seriously mentally ill; her GAF was listed as fifty, with her highest GAF from the last year listed as sixty.[3] (AR 271.)

Heckel applied for DIB and SSI payments on July 16, 2010. (AR 164.) In her disability report, Heckel stated that she had stopped working because of her conditions and mood change, because she could not afford medication, because she was having "constant 'personality' conflicts with co-workers" and failing to get work done, and because of poor attendance. (AR 168.) She reported inpatient treatment at three different southern Arizona facilities in 1991 through 1993 for suicide and homicide attempts, depression, anxiety, and various other mood disorders and emotional issues. (AR 174, 175, 176.) She also reported inpatient treatment at St. Luke's Behavioral Health Hospital in Phoenix, Arizona, for two weeks in late 2004 and early 2005 for suicide attempts, self-mutilation, dissociative disorder, anxiety, bipolar disorder, and PTSD. (AR 175.) Prior to her treatment at St. Luke's, Heckel received regular treatment from Mission Family Medical from 2001 through 2005 for many medical and psychological issues, including depression, suicide attempts, and anger and family issues. (AR 172.)

In her function report, Heckel claimed that because of her illness, she is unable to be in places with many people, stay calm in closed spaces, handle loud noises, go to parks or on walks with her housemate's dogs, or sleep regularly without night terrors. (AR 200.) Heckel reported

---

[3] A GAF score of fifty-one to sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n 34.

an ability to complete a variety of minor household chores and yard work. (AR 199, 201.) However, she said that tasks often take a long time if she gets overwhelmed or anxious, and these problems can often lead to anger or fear. (AR 204.) She avoids leaving the house alone unless she absolutely has to, she considers her family to be "dead" to her, and she avoids social activities that involve many people and open spaces. (AR 202, 204.) That said, she reported regular church attendance, and she goes shopping for groceries and pet supplies once a month. (AR 202-03.) Heckel does not keep a checking or savings account due to manic episodes causing her to overdraw her accounts. (AR 202.) She said that she can pay attention for fifteen minutes to an hour, and while she can follow written instructions "pretty well" after re-reading them several times, she can only follow spoken instructions well if they are "short/simple." (AR 204.) Heckel claimed that she "shut[s] down" in stressful situations and that she has been laid off by "everyone in the last 6 years" due to personality conflicts at work. (AR 205.)

Heckel's statements were largely echoed by a third-party function report completed by her housemate and "long time friend" Cody Dowers. (AR 208-15.) Dowers added that Heckel enjoys puzzles and "art activities" like painting and sewing (AR 208, 212), and she opined that "it would be good for [Heckel] to start seeing and talking to a therapist again" (AR 215).

The SSA referred Heckel to Shari Spies, Psy.D., for an evaluation on November 12, 2010. (AR 297.) Heckel began by describing how she was physically abused by her father from childhood into her thirties and how her mother, a very religious woman, has been hospitalized for depression numerous times. (AR 297.) She also reported repeated inpatient treatment for mental health issues starting in the seventh grade and a history of suicide attempts, with four attempts by drug overdose and five attempts by cutting herself. (AR 298.) Heckel further described an extensive history of alcohol abuse from childhood, abuse of prescription drugs

obtained without medical authorization, and recreational use of cocaine that continues through the present day "when available." (AR 299.) Heckel stated she was a daily marijuana user and had been for most of the previous ten years, smoking an ounce or more every two weeks depending on her anxiety levels, though she claimed to have stopped in 2009 when her ex-wife was in prison. (*Id.*)

With respect to present symptoms and mental health, Dr. Spies reported Heckel's mood and affect as sad and depressed with crying throughout the evaluation, a tangential thought process, and rapid and loud speech. (*Id.*) However, Heckel was dressed and oriented appropriately with good recall and a normal fund of information. (AR 299-300.) Heckel's descriptions of her depression, anxiety, manic episodes, sleep problems, compulsive spending, and workplace difficulties were consistent with those found in her function report. (*See* AR 298.) Additionally, Heckel described twice-weekly binging and purging since middle school, though she claimed this is moderated by marijuana use. (*Id.*) She also reported obsessive-compulsive behaviors such as constant cleaning and hand-washing and various checking routines to alleviate anxiety. (*Id.*) Heckel stated that she was currently receiving no medication or therapy despite having UNM Care coverage, as it is challenging for her to follow that program's directions and wait for appointments. (*Id.*)

Dr. Spies diagnosed Heckel as having bipolar I disorder, most recent episode depressed; PTSD; polysubstance dependence; bulimia nervosa, purging type; obsessive-compulsive disorder; and borderline personality disorder. (AR 300.) She also assessed Heckel as having a

GAF score of thirty-five.[4] (*Id.*) Dr. Spies concluded that Heckel's ability to understand and remember detailed or complex instructions and her ability to attend and concentrate are all "moderately limited" and that her ability to adapt to changes, use public transportation, or react appropriately to normal hazards is "markedly limited." (*Id.*) She also concluded that Heckel's ability to work without supervision is "mildly limited" but that Heckel is unable to interact with the public, with coworkers, or with supervisors. (*Id.*) Dr. Spies described Heckel's impulse control as "poor" and concluded that Heckel is unable to manage her money. (*Id.*) Dr. Spies recommended mental health counseling and evaluation for psychotropic medication, though she registered Heckel's concerns that she could not afford treatment. (*Id.*)

In mid-November 2010, x-rays revealed mild spondylosis deformans of the lumbar spine. (AR 303.) The following month, the SSA referred Heckel to Harry Burger, D.O., for a physical disability determination. (AR 306.) Dr. Burger complained of the lack of sufficient medical records regarding Heckel's gastrointestinal ailments and back problems (*id.*), but he speculated that Heckel suffers from IBS and congenital scoliosis (AR 309), and he commented that she was "in the most extreme morbidly obese category for her height, frame size, and age" (AR 308). Though he believed Heckel to be "aggravated" and "angry," he also observed that Heckel was "alert and oriented, for the most part cooperative," and he noted "no other abnormal affect behavior." (AR 309.) Still, he concluded that Heckel "most probably does have some degree of psychological issues." (*Id.*) He also noted Heckel's current marijuana usage despite the fact that she is not enrolled in a medical marijuana program. (AR 307.)

---

[4] A GAF score of thirty-one to forty indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Am. Psychiatric Ass'n 34.

In January 2011, Heckel underwent a mental RFC assessment and psychiatric review technique by Donald Gucker, Ph.D., whose analysis relied primarily on Heckel's application materials and records from MDC, Dr. Boyd, Dr. Burger, and Dr. Spies. (AR 310-26.) Dr. Gucker first observed that Dr. Burger had noted little abnormal affect or behavior other than anger and intermittent swearing. (AR 326.) He also pointed to Dr. Boyd's report that showed normal intellect and memory, good judgment, appropriate mood, no suicidal or homicidal ideation, and adequate insight, concentration, persistence, and pace. (*Id.*) By contrast, he found Dr. Spies's report to be "at total variance" with the other two records and commented twice that this report was based on Heckel's own assertions. (*Id.*) He also opined that "[a] credibility issue is likely present," as Heckel had told Dr. Boyd that she had stopped using marijuana, "which by her current admissions was not the case." (*Id.*)[5] Dr. Gucker concluded that if Heckel were "treatment and medication compliant" and not using illicit substances, "she would appear capable of understanding, remembering, and carrying out simple instructions, making simple decisions, attending and concentrating for two hours at a time, interacting appropriately with coworkers and supervisors, and responding appropriately to changes in routine work setting." (*Id.*; *see also* AR 312.)

Consistent with his review of the records, Dr. Gucker concluded that Heckel suffers from the following medically determinable impairments: bipolar disorder I, depression, PTSD, obsessive-compulsive disorder, a borderline personality disorder, and polysubstance dependence. (AR 314-23.) Regarding the "paragraph B" criteria for these impairments, Dr. Gucker assessed moderate restrictions in activities of daily living; moderate difficulties in maintaining social

---

[5] Dr. Gucker's comment regarding Heckel's credibility seems to be based on her statement to Dr. Burger that she was a current marijuana user. (AR 326.) The comment does not appear to take into account Heckel's statement to Dr. Spies that while she currently used marijuana, she stopped doing so while her partner was in jail—in other words, around the time of her visit with Dr. Boyd. (*See* AR 299.)

functioning; and mild difficulties in maintaining concentration, persistence, or pace. (AR 324.) Dr. Gucker found insufficient evidence to determine whether Heckel suffered from repeated and extended episodes of decompensation. (AR 324.) With respect to Heckel's bipolar disorder and depression, Dr. Gucker also concluded that the evidence did not establish the presence of "paragraph C" criteria. (AR 325.)

In his RFC assessment, Dr. Gucker assigned moderate limitations in understanding and remembering detailed instructions, but he found no other significant limitations as to Heckel's understanding and memory. (AR 310.) Regarding Heckel's sustained concentration and persistence, Dr. Gucker found no significant limitations in many respects, but he assessed moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule and maintaining regular attendance and punctuality, working in coordination with or proximity to others without distraction, and completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (AR 310-11.) Dr. Gucker assessed moderate limitations as to social interaction in all respects except as to Heckel's ability to ask simple questions or request assistance, where he found no significant limitations. (AR 311.) Finally, Dr. Gucker assessed moderate limitations in all respects as to Heckel's ability to adapt. (*Id.*) Although Dr. Gucker acknowledged that Dr. Spies found marked limitations in examining Heckel, he concluded from Dr. Spies's narrative and examination and from the disability reports that Heckel possessed more moderate functional abilities. (AR 312.) The SSA reached an initial determination of nondisability on January 5, 2011. (AR 57-58.)

On March 9, 2011, Heckel arrived at the Psychiatric Emergency Services department at the University of New Mexico ("UNM") Behavioral Health program, stating that she had started to cut herself again and was seriously contemplating suicide. (AR 346.) Heckel reported social and financial stressors and said that she was planning to give away her cats and to give belongings to charity. (*Id.*) According to Heckel's initial evaluation, her mood was sad, her insight was poor, her thought processes were "[m]ostly organized" though occasionally digressive, and her GAF score was fifty-five. (AR 347.) She was admitted for inpatient treatment and thereafter assessed with a GAF score of twenty-five[6] and diagnosed with an unspecified mood disorder, depression, obsessive-compulsive disorder, PTSD, bipolar disorder, an unspecified eating disorder, and a history of marijuana abuse. (AR 351-55.) When Heckel was discharged two days later, it was noted that despite her reports of suicidal ideation, her behavior was inconsistent with such claims, and she had interacted with other patients in a friendly and active manner. (AR 357.) Heckel's diagnosis was modified to an unspecified anxiety disorder, rule-out cannabis-induced mood disorder, rule-out panic disorder with agoraphobia, and borderline personality disorder, with a GAF of fifty. (AR 356.) Before doing so, doctors at the facility provided psychoeducation, altered her prescriptions, and advised her that chronic marijuana use could be affecting her mood and anxiety. (AR 357.) Heckel was also referred for dialectical behavioral therapy. (AR 358.)

Heckel's attorney's office filed an additional function report on her behalf on April 7, 2011, adding allegations of neuropathy and claiming that Heckel's ability to care for herself "is affected in all manners by [her] severe mental condition." (AR 224-31.) This report also states

---

[6] A GAF score of twenty-one to thirty indicates "[b]ehavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR gross impairment in communication." Am. Psychiatric Ass'n 34.

that Heckel can only pay attention for half an hour, that she cannot follow written or spoken instructions well, and that authority figures and airplanes flying overhead induce anxiety attacks. (AR 229-30.)

At an outpatient visit with Andrew R. Keyes, M.D., on April 8, 2011, Heckel expressed confusion and frustration with the UNM health care system due to delays and rescheduling of appointments, and she stated that she was taking smaller doses of Celexa since she could not afford an increased prescription. (AR 361.) Heckel was anxious to begin dialectical behavioral therapy and had attended orientation, and she was on a waiting list to get into the program. (*Id.*) She was diagnosed with PTSD, panic disorder with agoraphobia, cannabis dependence, bulimia, borderline personality disorder, and a GAF score of forty-six.

Heckel visited UNM's Psychiatric Emergency Services Department two days later, stating that she was suffering from a "manic and depressed" episode. (AR 343.) She noted that her outpatient provider had supplied five days' worth of Ambien due to insomnia, and now she claimed to feel tired, out of control, impulsive, and depressed. (*Id.*) Heckel conceded that the symptoms were likely attributable to her Ambien use. (*Id.*) Heckel's diagnosis was stable with a GAF of forty-five, and she was advised to seek individual therapy, to stop taking Ambien, and to continue with Celexa and with limited doses of Seroquel at bedtime. (AR 340-41, 344.) She was not admitted for inpatient treatment at that time. (AR 343-44.)

In mid-May 2011, agency doctors reconsidered the initial denial of DIB and SSI payments. (AR 367-68.) Her physical RFC was considered unchanged from the initial denial. (AR 367.) On examination of her first mental RFC assessment and subsequent records, Renate Wewerka, Ph.D., noted some "passive" suicidal ideation and functional limitations, but she observed that Heckel was receiving treatment with a near-normal mental status examination and

a GAF in the 50's. (AR 368.) Opining that Heckel's reported limitations were consistent with a

capacity for unskilled work, Dr. Wewerka affirmed the initial RFC assessment. (*Id.*) The SSA

officially affirmed the denial of DIB and SSI payments on May 19, 2011. (AR 59-61.)

### HEARING TESTIMONY

On March 20, 2012, the ALJ held an in-person hearing at which both Heckel and a

vocational expert ("VE") testified. (AR 23.) Heckel was represented by an attorney. (*Id.*) Heckel

testified to extensive experience in finance positions, but she noted that she missed work several

times a month due to extended depression and that she frequently engaged in quarrels with

coworkers and customers. (AR 29-31, 33.) She stated that she had experienced multiple periods

of hospitalization for suicidal ideation and self-harm in the past five years. (AR 37-38.) Heckel

also discussed her challenges with finances, pinning these problems on five- or six-day manic

episodes. (AR 34.) Additionally, Heckel pointed to unfamiliar places, large groups of people, and

questions about her past as PTSD triggers that lead to insomnia and anxiety. (AR 36.) Although

Heckel had insurance with UNM Care, it had lapsed and she found the "bureaucratic system to

get back on it" to be frustrating. (AR 31.) When her attorney suggested a program called

Healthcare for the Homeless, Heckel replied that she gets anxious being around "people that are

that dirty." (AR 38-39.) However, she also stated that she was receiving cash assistance and food

stamps. (AR 42.)

As for her daily activities, Heckel testified to watching television, reading mystery novels

and "philosophical stuff," using her tablet computer to play online games and talk on Facebook,

completing various chores, and caring for her pets. (AR 40-41, 43-44.) Additionally, Heckel

admitted to occasional excessive drinking and to daily marijuana use to manage anxiety and

other impairments. (AR 44-47.) On this last point, Heckel claimed that she spends $50 per month

on marijuana and that this seemed more cost-effective than applying for the state's medical marijuana program or spending $200 or $300 a month on prescriptions. (AR 45.)

After the ALJ and Heckel's attorney questioned Heckel, the ALJ spoke to the VE, Sandra Schneider, regarding Heckel's past work history and her ability to work in the future. (AR 47-53.) Having reviewed Heckel's past work, the ALJ first asked the VE if a hypothetical person of Heckel's age, education, and work experience could perform any work if she were limited to understanding, remembering, and carrying out simple instructions; maintaining attention and concentration to perform simple tasks for two hours at a time without requiring redirection; occasional contact with the general public; and work not requiring her to be part of a close-knit team and not involving more than occasional changes to the routine setting. (AR 48-49.) The VE testified that such a person could not perform Heckel's past work, but she also said this person could perform medium-level work as a hand packager, medium-level work as a janitor, light-level work in other cleaning positions, and light-level work as a cloth folder. (AR 49-50.) However, such a person could not find work in the regional or national economy if this person had the same limitations but with no interaction with the public or coworkers, occasional interaction with a supervisor, and no ability to adapt to change or normal workplace hazards. (AR 52-53.) Regardless of these limitations, such a person also could not maintain employment if she were absent more than once a month or if she used the restroom six times or more every shift for ten minutes apiece. (AR 50, 52.)

### THE ALJ'S AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Heckel's claim pursuant to the five-step sequential evaluation process. (AR 12-13.) She first determined that Heckel had not engaged in substantial gainful activity since her onset date. (AR 13.) She then found that Heckel suffered from the following severe

impairments: major depressive disorder, anxiety disorder, borderline personality disorder, and substance abuse. (*Id.*) In doing so, the ALJ determined that Heckel's alleged back problems and her gastrointestinal condition did not constitute severe impairments. (AR 13-14.)

At step three, the ALJ concluded that Heckel did not have an impairment or combination of impairments which met the criteria of listed impairments under Appendix 1 of the SSA's regulations. (AR 24-26.) Finding that the state agency physicians' opinions were "well reasoned and supported by the evidence of record," the ALJ first determined that Heckel had only mild restrictions on activities of daily living; moderate difficulties in social functioning and in concentration, persistence, or pace; and no extended episodes of decompensation. (AR 14-15.) In reaching this determination, the ALJ looked to Heckel's two function reports and testimony to observe that Heckel can engage in household chores, care for animals, watch television, read novels, and shop, communicate, and play games online "with no apparent difficulty." (AR 15.) As such, the ALJ found that the "paragraph B" criteria for Heckel's severe impairments were not satisfied. (*Id.*) She also concluded that the evidence did not establish the presence of "paragraph C" criteria. (*Id.*)

The ALJ proceeded to evaluate Heckel's RFC, relying on and discussing Heckel's testimony and records from Dr. Boyd, Dr. Spies, the UNM Behavioral Health program, Dr. Burger, Dr. Gucker, and Dr. Wewerka. (AR 16-20.) The ALJ did not discuss Heckel's March 2011 inpatient treatment. (*See id.*) While acknowledging that the evidence of record shows "a long-standing history of mental instability," the ALJ concluded that Heckel's characterization of her symptoms and limitations were inconsistent with medical records and that her actions otherwise reflected negatively on her credibility. (AR 18.) For example, despite Heckel's claims of difficulty interacting with bureaucracy to get health insurance, the ALJ observed that the

15

bureaucratic application process for food stamps and cash assistance did not prevent Heckel from applying for and receiving those benefits. (AR 19.) Additionally, Heckel's estimate that she spends only $50 on marijuana struck the ALJ as unlikely given that Heckel admitted to smoking every day, and there was no evidence that Heckel had sought low-cost medication assistance to reduce the barrier for obtaining legal prescriptions for her ailments. (*Id.*) Moreover, her statements to Dr. Burger regarding pulmonary disease and cocaine use were inconsistent with her statements to other medical providers. (*Id.*) Finally, the ALJ found Heckel to be focused and cheerful when the two were conversing at the hearing, whereas Heckel was tearful and emotional when discussing her impairments with her attorney. (*Id.*) This led the ALJ to believe "that if [Heckel] could find employment within her residual functional capacity, it would help her to take her mind off her mental condition and help alleviate some of her symptoms." (*Id.*)

Based on her findings, the ALJ determined that Heckel possessed an RFC to perform a full range of work at all exertional levels, provided that she was limited to understanding, remembering, and carrying out only simple instructions; maintaining concentration and attention to perform simple tasks for two hours at a time without requiring redirection; only occasional contact with the general public; no work with a close-knit team; and work that involves no more than occasional changes to the routine work setting. (AR 16.) In doing so, the ALJ gave "great weight" to the SSA medical consultants' opinions (AR 20), and she stated that the RFC "accounted for" the restrictions set forth by Dr. Spies (AR 19). The ALJ also found that Heckel's statements as to the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with this RFC. (AR 17.)

Relying on this RFC, the ALJ concluded that while Heckel could not perform any of her past relevant work, she was able to perform other jobs that exist in significant numbers in the

national economy, citing the four positions mentioned by the VE at the hearing as examples. (AR 20-22.) On that basis, the ALJ determined that Garcia was not disabled under the meaning of the Social Security Act and not entitled to benefits. (AR 22.) Heckel appealed the decision to the Appeals Council, but the Council found that Heckel's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-4.)

DISCUSSION

Heckel raises multiple challenges to the ALJ's decision to deny DIB and SSI payments, which I reorganize so as to follow the five-step sequential evaluation process. Heckel argues that the ALJ erred at step three in failing to discuss her inpatient hospitalization records as evidence of decompensation. (Doc. 19 at 21-22.) Heckel also argues that the ALJ should have discussed the weight accorded to Dr. Spies's opinion and explained why she was rejecting some of Dr. Spies's findings when developing Heckel's RFC at step four. (*Id.* at 14-16.) Heckel raises other arguments of error at this step and later regarding the ALJ's treatment of the state agency consultants' opinions (*id.* at 16-17), her statement that none of the medical providers concluded that Heckel could not work within the assigned RFC (*id.* at 19-20), her statement that Heckel would benefit from work that would "take her mind off her mental condition" (*id.* at 20-21), and her hypothetical questions to the VE (*id.* at 17-19). Because I find that the ALJ committed reversible error at step four with respect to her treatment of Dr. Spies's findings and opinion, I do not address Heckel's additional claims of error at that step or beyond.

## I.    Impact of Hospitalization Records at Step Three

Although Heckel underwent psychiatric hospitalization at the UNM Behavioral Health department (AR 346-59), the ALJ altogether failed to discuss the medical records for that

inpatient treatment. Heckel argues that the hospitalization incident provides evidence of decompensation (Doc. 19 at 22), which is particularly relevant to step three considerations. Heckel also argues that hospitalizations such as this incident might impact her ability to maintain employment and that the ALJ was therefore required to discuss it. (*Id.*)

Despite the Commissioner's implication to the contrary (Doc. 20 at 12), an ALJ's statement that she considered "all the evidence" is not by itself sufficient. *See Salazar v. Barnhart*, 468 F.3d 615, 622 (10th Cir. 2006). It is true that the ALJ does not need to discuss every piece of evidence in her decision. *Wall*, 561 F.3d at 1067 (citation omitted). However, if there is significantly probative medical evidence in the record that does not support her decision, the ALJ must discuss that evidence and her reasons for rejecting it. *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (citing *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)).

For the SSA to conclusively presume that a claimant is disabled at step three, her severe impairments must meet or be medically equivalent to a condition listed in Appendix 1 of the SSA's regulations. *See* 20 C.F.R. Part 404, subpt. P, app'x 1. According to the "paragraph B" criteria in that Appendix, the severe impairments that the ALJ found Heckel to possess would satisfy this step-three analysis if she were found to have at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or "repeated episodes of decompensation" in one year, each episode lasting at least two weeks. *See id.* §§ 12.00(C), .04(B), .06(B), .08(B).

Here, the ALJ did not find that Heckel possessed marked restrictions or difficulties in any of the first three categories, and she found no evidence of any extended decompensation. (AR

15.) Even if the ALJ had determined that Heckel's inpatient treatment showed evidence of decompensation, it does not appear that the single two-day hospitalization would show evidence of "repeated" decompensation episodes lasting two weeks or more. Moreover, because the ALJ found no marked restrictions in the remaining categories, even evidence of repeated episodes of extended decompensation would not satisfy the "paragraph B" criteria. Therefore, although the ALJ may have erred in failing to discuss the hospitalization incident, any such error would be harmless at step three and could not serve as grounds for remand. 20 C.F.R. § 498.224; *see also Barber v. Astrue*, 431 F. App'x 709, 713 (10th Cir. 2011) (unpublished).

Heckel also contends that the ALJ's failure to discuss her psychiatric hospitalization records constitutes error at later steps. (Doc. 19 at 22; Doc. 21 at 6.) However, I do not address this argument, for even if the ALJ did not err in this respect, her treatment of Dr. Spies's findings and opinion requires me to remand this action for further proceedings.

## II.    Considerations Regarding Dr. Spies's Opinion

The ALJ's evaluation of a claimant's physical and mental RFC constitutes the first of three phases of the step-four analysis. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citing *Winfrey*, 92 F.3d at 1023). Heckel raises several objections to the ALJ's discussion of Dr. Spies's findings and opinion at this phase. Even though the ALJ claimed that her RFC "accounted for" Dr. Spies's restrictions (AR 19), Heckel argues that the ALJ erred in failing to address or agree with several limitations that Dr. Spies found to exist (Doc. 19 at 14-15). She also asserts that the ALJ erred in failing to state the amount of weight she was giving to Dr. Spies's findings and opinion. (*Id.* at 15-16.)

When, as here, a treating source's opinion is not expressly granted controlling weight, an ALJ must explain the weight she gives to the medical opinions she considers. *See* 20 C.F.R.

§§ 404.1527(c), (e)(2)(ii); *id.* §§ 416.927(e)(2)(ii). When deciding the weight to assign a medical opinion, the ALJ must consider the factors set forth at 20 C.F.R. §§ 404.1527(c)(1)-(6) and 416.927(c)(1)-(6), which include the examining relationship, the length and nature of the treatment relationship, the supportability of the findings, their consistency with the record as a whole, and the source's status as a specialist. *See id.* §§ 404.1527(e)(2)(ii), 416.927(3)(2)(ii); *see also Lauxman v. Astrue*, 321 F. App'x 766, 769 (10th Cir. 2009) (unpublished). "The decision must articulate the ALJ's reasoning such that later reviewers can identify both the weight that was actually assigned to the opinion and the reasons for that weight." *Andersen v. Astrue*, 319 F. App'x 712, 719-20 (10th Cir. 2009) (unpublished) (citation omitted) (discussing treating source opinions).

ALJs are also guided by Social Security Ruling ("SSR") 96-8p in crafting an RFC assessment. *See* 1996 WL 374184 (July 2, 1996). SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See* 20 C.F.R. § 402.35; *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference). Relevantly, SSR 96-8p requires the ALJ to explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *See* 1996 WL 374184, at *7. "If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." *Id.*

Still, the ALJ's analysis need not always be express. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). For example, "an ALJ's rejection of a non-treating physician's opinion adequately demonstrate[s] his consideration of the opinion's consistency with other

evidence in the record," *see Lauxman*, 321 F. App'x at 769 (citing *Doyal*, 331 F.3d at 764), though the ALJ must still "set forth 'specific, legitimate reasons'" for rejecting or disregarding a medical report, *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (citation omitted). Further, "[w]hen the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). Accordingly, courts may disregard as harmless error an ALJ's failure to clearly assign weight to an opinion if the claimant would not have benefited had the ALJ incorporated the opinion's findings. *See, e.g.*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 2012) (finding no error where the ALJ did not discuss the weight or persuasive value assigned to an opinion that found no significant limitation in work function and an opinion that was "generally consistent" with the RFC).

Here, the ALJ did not expressly state the weight that she gave to Dr. Spies's opinion. The ALJ also did not reject Dr. Spies's findings altogether. (*See* AR 19 ("The restrictions set forth by Dr. Spies . . . are accounted for in the residual functional capacity.").) However, it appears that the ALJ rejected several of Dr. Spies's restrictions without explaining her reasons for doing so. For example, while Dr. Spies concluded that Heckel is "unable to interact with the public, with coworkers, or supervisors" (AR 300), the ALJ assigned an RFC that allows occasional contact with the public, that does not address interaction with supervisors at all, and that apparently allows for unlimited contact with coworkers provided that Heckel is not "part of a close-knit team" (AR 16). Similarly, although Dr. Spies noted a marked limitation in Heckel's ability to react appropriately to normal workplace hazards (AR 300), the ALJ's RFC does not include any limitation regarding workplace hazards (*see* AR 16), and it is unclear how such a marked limitation would translate to the limitations the ALJ did assign. As such, the RFC is in conflict

with Dr. Spies's opinion, and the ALJ has failed to explain why that opinion was not adopted. This error requires remand.

In response, the Commissioner points out that "the regulations do not require a direct correspondence between a physician's medical opinion and the RFC assessment because the ALJ, not a doctor, is tasked with determining a claimant's FRC from all of the evidence." (Doc. 20 at 7-8 (citing *Wells v. Colvin*, 727 F.3d 1061, 1071 (10th Cir. 2013)).) This statement is undoubtedly true, and the ALJ is not required to adopt Dr. Spies's opinion as her own or give it great weight if she finds it to be inconsistent with the evidence as a whole. *See, e.g.*, 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Nonetheless, the ALJ is required to discuss ambiguities or inconsistencies in the record and explain how they are to be resolved. *See* SSR 96-8p, 1996 WL 374184, at *7. On remand, the ALJ must discuss the weight given to Dr. Spies's opinion and, if rejecting it in whole or in part, explain why she is doing so.

## CONCLUSION

The ALJ erred in her review of Heckel's applications for DIB and SSI payments. Although her failure to discuss Heckel's March 2011 inpatient treatment did not constitute error at step three, the ALJ did not apply the correct legal standards with respect to her treatment of Dr. Spies's findings and opinion. As such, I grant Heckel's motion to reverse, and I remand this case back to the SSA for proceedings consistent with this opinion.

IT IS SO ORDERED.

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.

22